# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

In the Matter of the Search of )
**9994 Loralinda Drive,** )
**Cincinnati, Ohio 45251** ) Case No. 1:20-mj-317
)
)
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the _____Southern_____ District of _____Ohio_____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☐ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841 | Conspiracy to posses with intent to distribute a controlled substance |
| 21 U.S.C. 846 | |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Tyler D. Field, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.
(via electronic means)

Date: **Apr 22, 2020**

_____
Karen L. Litkovitz
United States Magistrate Judge

City and state: _____Cincinnati, Ohio_____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

IN THE MATTER OF THE SEARCH OF: | CASE NO. 1:20-mj-317

9994 Loralinda Drive, Cincinnati, Ohio 45251

**UNDER SEAL**

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Tyler D. Field, Special Agent with the Drug Enforcement Administration, being first duly sworn, hereby state:

1. This affidavit is submitted in support of an application for search warrants for evidence, contraband, fruits and instrumentalities of crime, property used or intended to be used in the commission of crime(s), related to evidence of a conspiracy to possess with intent to distribute marijuana.

2. For all the reasons outlined in this affidavit, I have probable cause to believe that evidence related to these crimes will be located within the following **Subject Locations** which are more fully described in **Attachment A** (attached hereto and incorporated herein by reference):

   a. 9994 Loralinda Drive, Cincinnati, Ohio 45251;

   b. 2010 white Dodge Challenger, VIN: 2B3CJ5DT1AH149186 with Ohio license plate HYW1615 (the Challenger);

   c. 2020 black Kia SUV with VIN: 5XYP3DHC9LG053287 with Ohio license plate BUMPYJ (the Kia).

3. This affidavit is submitted in support of an application for warrants to search the above listed **Subject Locations** more fully described in **Attachment A** for evidence, contraband, fruits and instrumentalities of crime, property used or intended to be used in the commission of crime(s),

as more particularly described in **Attachment B** (incorporated herein by reference). This affidavit is for the limited purposes of demonstrating probable cause. Therefore, I have not set forth each and every fact I have learned during this investigation, but only those facts and circumstances necessary to establish probable cause. The facts reported in this affidavit are based on my own knowledge and the knowledge of other law enforcement officers/agents involved in the investigation.

## TRAINING AND EXPERIENCE

4. I am a Special Agent (SA) of the Drug Enforcement Administration (DEA) and have been so employed since March 2016. I also serve as a U.S. Army Military Police Major in the Indiana Army National Guard and have done so for over eighteen years. Prior to being employed with the DEA, I was employed as a police officer for the Town of Bridgewater, Massachusetts for over three years. I have graduated from the U.S. Army Military Police School, Plymouth Police Academy, and DEA Basic Agent Academy. During those courses I received training in the investigation of offenses involving controlled substances. As a Special Agent of the DEA, my duties and responsibilities include conducting criminal investigations for violations of federal law, particularly those found in Title 21 and Title 18 of the United States Code. As a DEA agent, I have participated in approximately twenty criminal investigations seeking evidence of violations of the Federal Controlled Substances Act (Title 21, of the United States Code).

5. I am currently assigned to the Cincinnati Resident Office of the DEA. I received specialized training from the DEA, including the 18-week Basic Agent Training course. That training focused on methods of unlawful drug trafficking; the identification of controlled substances; surveillance; undercover operations; confidential source management; the means by which drug traffickers derive, launder, and conceal their profits from drug trafficking; the use of assets to facilitate unlawful drug trafficking activity; and the law permitting the forfeiture to the United States of assets purchased with drug proceeds or assets used or intended to be used to facilitate the drug violations.

## SUMMARY OF INVESTIGATION

6. On December 3, 2018, Latoya JONES was stopped at the Cincinnati Airport (CVG) with approximately 120 pounds of high grade marijuana. JONES admitted that she was a courier for Trenton YARBROUGH and told officers that YARBROUGH was waiting for her outside the terminal. Airport security cameras documented YARBROUGH in a gold-colored Chrysler parked outside of baggage claim. Law enforcement attempted to make contact with YARBROUGH but YARBROUGH sped away before contact was made.

7. On Friday March 27, 2020, at approximately 4:50 pm officers/agents initiated surveillance on a Black BMW and white Nissan Altima suspected to be travelling from Toledo, Ohio to Louisville, Kentucky to purchase controlled substances. Officers/agents instead observed the vehicles travel to the Big Lots parking lot located at 9690 Colerain Avenue Cincinnati, Ohio. Officers/agents later observed a white Dodge Challenger (bearing Ohio license plate HYW1615) arrive and park between the BMW and the Nissan. According to the Ohio Bureau of Motor Vehicles, Ohio license plate HYW1615 is registered on a 2010 white Dodge Challenger with VIN: 2B3CJ5DT1AH149186 to Marlon WILKINSON at 9994 Loralinda Dr, Cincinnati, Ohio 45251. WILKINSON exited the Challenger and spoke to the occupants of the BMW and Nissan. After what appeared to be a short discussion WILKINSON retrieved two duffle bags from the trunk compartment of the Challenger and placed the bags into the trunk of the Nissan. After the exchange the BMW and Nissan departed the parking lot and traveled across the street to the Speedway before proceeding back towards Toledo, Ohio. Officers/agents maintained surveillance on these vehicles.

8. Officers/agents were unable to maintain surveillance on the Challenger from the parking lot but noted that the Big Lots parking lot was in close proximity to 9994 Loralinda Dr. Officers/agents immediately responded to 9994 Loralinda Dr and observed the Challenger parked on the street in front of 9994 Loralinda Dr. Based on my training, experience, discussions with other law enforcement officers/agents, my knowledge

that the Big Lots parking lot where WILKINSON met with the occupants of the Nissan and BMW was in close proximity to 9994 Loralinda Drive, and my knowledge that shortly after WILKINSON departed the Big Lots parking lot in the Challenger officers/agents observed his Challenger parked in front of 9994 Loralinda Drive, I believe that WILKINSON travelled from the Big Lots parking lot directly to 9994 Loralinda Drive.

9. At approximately 7:06 pm officers/agents initiated a traffic stop on the Nissan as it was travelling northbound on I-75 near Lima, Ohio. Ohio State Troopers recovered approximately 19 pounds of suspected high grade marijuana from the bags that WILKINSON had placed in the Nissan's trunk. Based on my training, experience, discussions with other law enforcement officers/agents, and my knowledge that WILKINSON had previously placed the duffel bags containing the suspected marijuana into the trunk of the Nissan at the Big Lots parking lot, I believe that WILKINSON distributed the suspected marijuana to the occupants of the Nissan. Based on my belief that WILKINSON travelled directly from the Big Lots parking lot to 9994 Loralinda Drive, I believe that WILKINSON returned to 9994 Loralinda Drive with drug proceeds and/or other evidence of this transaction.

10. On April 9, 2020, officers/agents examined the contents of trash cans placed on the curb in front of 9994 Loralinda Drive. Officers/agents observed mail addressed to WILKINSON and Dominque Dukes names at 9994 Loralinda Drive.

11. On Friday April 10, 2020, at approximately 4:45 pm officers/agents observed YARBROUGH arrive in a gold-colored Chrysler and park in front of 9994 Loralinda Drive. YARBROUGH then walked inside the residence. After a short period of time WILKINSON and YARBROUGH exited the residence and spoke on the sidewalk for several minutes before YARBROUGH departed.

12. On April 16, 2020 at approximately 1:58 p.m., officers/agents observed WILKINSON, via a camera installed on public property, walk away from 9994 Loralinda Drive. WILKINSON opened the front passenger door of a Kia Telluride with Ohio license plates BUMPYJ parked

4

on the street directly in front of 9994 Loralinda Drive. According to the Ohio Bureau of Motor Vehicles, Ohio license plate BUMPYJ is registered on a black 2020 Kia SUV with VIN: 5XYP3DHC9LG053287 to WILKINSON at 9994 Loralinda Drive. WILKINSON closed the front passenger door of the Kia and opened the driver's door of his white Dodge Challenger which was parked on the street directly in front of the Kia. WILKINSON removed a bag from the Challenger and then placed the bag inside the driver's door of the Kia. WILKINSON then entered the driver's door of the Kia. WILKINSON departed the area in the Kia and was followed by surveillance. At approximately 2:32 p.m., officers/agents observed the Kia park on Losantiville Avenue, Cincinnati, Ohio. WILKINSON walked into the garage of 2311 Losantiville Avenue. According to the Ohio Bureau of Motor Vehicles, YARBROUGH listed 2311 Losantiville Avenue as his address on his license. Consequently, I believe that WILKINSON travelled to 2311 Losantiville Avenue to meet with YARBROUGH.

13. At approximately 3:35 p.m., officers/agents observed James DICKENS walk from Mayflower Avenue and walk into the garage at 2311 Losantiville Avenue. At approximately 3:47 p.m., officers/agents observed DICKENS walk away from 2311 Losantiville and walk back towards Mayflower Avenue. DICKENS entered a Chevrolet Equinox parked on Mayflower Avenue. The Equinox departed the area and was followed by surveillance. At approximately 4:02 p.m. TFO David Theobald, operating a marked Ohio State Highway Patrol vehicle, conducted a motor vehicle stop on the Equinox in the area of mile marker 15.2 on I-71 north. TFO Theobald directed DICKENS out of the vehicle and frisked DICKENS for weapons. TFO Theobald felt a bulge in DICKENS' pants pocket and DICKENS told TFO Theobald that it was an ounce of marijuana. TFO Theobald seized the suspected marijuana and processed the suspected marijuana in accordance with Ohio State Highway Patrol policies and procedures. At approximately 5:17 p.m., the court-authorized tracking device installed on the Kia indicated that the Kia departed the area of 2311 Losantiville and travelled to the area of 9994 Loralinda Drive, arriving at approximately 5:35 p.m.

5

14. Based on my training, experience, discussions with other law enforcement officers/agents, JONES' statement in December 2018 that she was transporting a large amount of marijuana for YARBROUGH, my belief that WILKINSON was involved in a transaction of approximately 19 pounds of suspected marijuana on March 27, 2020, my knowledge that on April 16, 2020 WILKINSON travelled to YARBROUGH's residence, and my knowledge that DICKENS was stopped with approximately one ounce of suspected marijuana after leaving YARBROUGH's residence, I believe that WILKINSON and YARBROUGH are involved in a marijuana trafficking conspiracy.

15. Based on my training, experience, discussions with other law enforcement officers/agents, my belief that on March 27, 2020 WILKINSON, operating the Challenger, travelled from the Big Lots parking lot to 9994 Loralinda Drive with drug proceeds and/or other evidence of the suspected marijuana transaction, my belief that WILKINSON and YARBOROUGH are involved in a marijuana trafficking conspiracy, my knowledge that on April 10, 2020, YARBOROUGH and WILKINSON met at 9994 Loralinda Drive, my knowledge that on April 16, 2020, WILKINSON, operating the Kia, travelled directly from 9994 Loralinda Drive to YARBROUGH's residence, my knowledge that DICKENS was stopped with approximately one ounce of suspected marijuana after leaving YARBROUGH's residence, and my knowledge that WILKINSON returned to 9994 Loralinda Drive upon departing YARBROUGH's residence, I believe that evidence of WILKINSON's and YARBROUGH's marijuana trafficking activities will be found at 9994 Loralinda Drive, the Challenger, and the Kia.

**ITEMS COMMON TO SEARCH/SEIZE**

16. Based upon my training and experience, the training and experience of other law enforcement officers and the facts contained herein, I know materials searched for and recovered in locations involved in drug investigations have included various controlled substances, including, but not limited to: marijuana; drug paraphernalia such as scales, papers and drug

6

packaging materials; books and records reflecting sales, the transfer or transportation of drugs and amounts of monies owed for drugs; records reflecting the names, addresses, and telephone numbers of co-conspirators; sales receipts and other records reflecting the expenditure of monies that are the proceeds from unlawful drug distribution; currency and money wrappers; records of transactions to conceal and launder drug trafficking proceeds; and various valuable assets purchased with the proceeds of unlawful drug trafficking. These items, obtained by search warrants, constituted evidence of Federal drug violations.

17. Based upon my training and experience, my participation in this investigation, and other drug trafficking investigations, I have reason to believe that:

   a. drug traffickers often place assets in names other than their own to avoid detection of these assets by government and law enforcement agencies;

   b. drug traffickers often place assets in names of business/corporate entities as nominee title holders in order to avoid detection of these assets by government and law enforcement agencies; even though these assets are placed in the names of other persons or entities, the drug traffickers continue to use these assets and exercise dominion and control over them;

   c. drug traffickers must maintain and/or have quick access to large amounts of United States currency or other liquid assets in order to maintain and finance their ongoing drug business;

   d. drug traffickers often maintain money counting machines, money wrappers and rubber bands, boxes, bags, brief cases, suitcases, or containers used to carry drug proceeds and/or controlled substances;

   e. drug traffickers often maintain in their residences and/or business establishments records relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed including some or all of the following written books, records,

receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers (i.e. bank account records, wire transfer records, bank statements, safe deposit box keys and records, money wrappers, rubber bands, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the illegal sale of drugs);

f. drug traffickers commonly use cellular phones to communicate with other members of the DTO, narcotics source of supply(s), and/or narcotics customers in furtherance of violations of the Uniform Controlled Substances Act;

g. drug traffickers commonly provide illegal narcotics to their organization on consignment sale to their customers, who subsequently pay for the drugs after reselling said drugs. Therefore, the above-mentioned books, records, receipts, notes, ledgers, etc., will be secured by the drug traffickers within their residences and/or their businesses for their ready access for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

h. drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone numbers of drug associates within their residence and/or place of business, their business vehicles, or the curtilage of their residence or business for ready access and to hide them from law enforcement agencies;

i. drug traffickers commonly will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services (i.e., safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts), and evidence of this includes documents like stock certificates, bonds, deposit certificates, and travelers checks;

j. drug traffickers often have photographs or video movies of themselves, their co-conspirators and the property and assets purchased with drug proceeds. These

8

photographs and video movies are normally in the drug traffickers possession, their residence and/or their place of business;

k. drug traffickers' methods of transporting drugs include but are not limited to: commercial airlines, private motor vehicles, and government and contract mail carriers. I know that the vehicles, residences, or business locations of drug traffickers will often contain records of drug-related travel. These records may include airline ticket receipts, credit card receipts, traveler vouchers, hotel and restaurant receipts, photographs, canceled checks, maps, and written directions to locations rental car receipts and luggage tags reflecting points of travel;

l. drug traffickers commonly have firearms in their possession (on their person, at their residence, and/or their business) including but not limited to handguns, rifles, shotguns and automatic weapons. These firearms are most often used and/or maintained in order to protect and secure a drug trafficker's property or manufacturing operation;

m. it is common for drug traffickers to secrete in their vehicles items identified in the above paragraphs;

n. drug traffickers will often accumulate and maintain substantial amounts of drug proceeds, specifically currency, over a period of years, so that the proceeds can be used in later years for personal asset acquisitions and/or expenditures during periods when a drug trafficker is not distributing drugs;

o. drug traffickers commonly will maintain residence(s) separate from their primary residence to serve as "safe houses" where the traffickers may stay for periods of time; I know that these residences which may be occupied by other conspirators or associates may contain elements of the traffickers drug crimes to include all items noted above;

p. drug traffickers commonly have evidence of purchases of goods used in the manufacture of controlled substances secreted in their residences, businesses, or vehicles; and

9

q. drug traffickers commonly secret in their residences and/or places of business, over a period of years, items such as those identified in the above paragraphs.

## CONCLUSION

18. I believe the facts contained within this affidavit support probable cause to believe that WILKINSON and others are involved in distributing controlled substances. Based on my training, experience, discussions with other law enforcement officers/agents, and the information contained herein, I believe that probable causes exists that the items listed in Attachment B as evidence, contraband, fruits and instrumentalities of crime, persons to be arrested, property used or intended to be used in the commission of crime(s), related to evidence of a conspiracy to possess with intent to distribute, and distribute marijuana, will be found at the **Subject Locations** identified in **Attachment A**.

19. Assistant United States Attorney Ashley Brucato has reviewed this affidavit and the associated application and warrants and as in his opinion they are legally and factually sufficient, I respectfully ask the Court to authorize the requested search warrants.

Tyler D. Field
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on this 22nd day of April 2020.

Karen L. Litkovitz
United States Magistrate Judge

10

# ATTACHMENT A

**9994 Loralinda Drive, Cincinnati, Ohio 45251** is described as a two-story single family structure constructed of red brick and tan siding. The front door of the residence faces west. The numbers "9994" appear in white numbers above the garage door.

Any and all vehicles located within outbuildings, garages, and/or the curtilage



**Affidavit of Special Agent Tyler Field**  Page 12

# **ATTACHMENT B**

a. Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity and/or times when drugs were obtained, transferred, sold, distributed, and/or concealed;

b. Bank account records, wire transfer records, bank statements, safe deposit box keys and records, money wrappers, rubber bands, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the illegal sale of drugs;

c. Cellular telephones, digital telephones, car telephones, or other communications devices which evidence participation in a conspiracy to distribute controlled substances.

d. Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

e. Any computer equipment, digital device, magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and any other digital device capable of accessing the internet and capable of being used to commit or further the crimes outline above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes.

f. Financial instruments purchased with currency derived from the sale of controlled substances, including travelers' checks, bonds, stock certificates, cashier's checks, and certificates of deposit;

g. Money counting machines, money wrappers and rubber bands, boxes, bags, brief cases, suitcases, or containers used to carry controlled substances;

h. Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of the sales of controlled substances;

i. Records, items and documents reflecting travel for the purpose of participating in drug trafficking, including airline tickets, credit card receipts, traveler vouchers, hotel and restaurant receipts, photographs, canceled checks, maps, and written directions to locations;

j. Handguns, shotguns and other firearms, and ammunition, which may be used to facilitate the distribution or possession with intent to distribute controlled substances;

k. Indicia of ownership and use of the vehicles, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, escrow documents, keys and bank account records, registration, title, insurance, and traffic tickets;

l. Photographs or video movies of drug traffickers, their co-conspirators and the property and assets purchased with drug proceeds.

m. Controlled substances, including, but not limited to, marijuana.

n. Drug paraphernalia, which can be used to store, package, weigh, dilute, and ingest controlled substances; equipment pertaining to marijuana, and any other supplies related to the manufacture and distribution of said controlled substances.

o. United States currency, precious metals, jewelry, financial instruments and stocks and bonds; and

p. Any locked or closed containers, to include safes or lockboxes, believed to contain any of the above listed evidence

**Affidavit of Special Agent Tyler Field**        **Page 16**